U.S. DISTRICT COURT
DISTRICT OF NH

2019 JUN 21 AM 10: 16

FILED

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE**

UNITED STATES OF AMERICA
Plaintiff,
v.

WILLIAM A. BISCHOFF
Defendant.

Case No. 17-cr-00196

June 20, 2019

**MOTION TO REDUCE SENTENCE PURUSANT TO §2255**

NOW COMES THE PETITIONER, William A Bischoff (hereafter "Petitioner" or "Mr. Bischoff") to move this Honorable Court to reduce his sentence to time served or to at least 24 months based on the facts discussed below.

On June 20, 2018, this Court sentenced Petitioner to 48 months, which he is currently serving at FMC Devens. The Petitioner respectfully suggests to the Court that he was over-sentenced based on the fact that his Plea Agreement specifically stated that if he could post a payment of $1 million for restitution; he would be sentenced to only 24 months. (See Plea Agreement Paragraph 6). Not only was this an egregious violation of both the Due Process Clause of the Fifth Amendment, and equal rights under the law promised by the Fourteenth Amendment, Petitioner wishes to assert that his sentence is not only much more than necessary pursuant to 18 U.S.C. §3553, it is also far greater than the sentences given to much more notable offenders involving hundreds of millions if not billions of dollars in losses. Moreover, Petitioner believes he was over-sentenced because the Government did not credit him with all of the disbursements made to his investors in the past, nor did the Government give Petitioner credit for the fair market value of assets that could be sold at any time, thereby making most of the investors whole.

Because the loss in this case caused a disparate sentence, much higher than other people who truly committed a fraud against victims, Petitioner respectfully requests that this Court reduce his sentence to time served or to at least 24 months as promised in the Plea Agreement if Petitioner had only been a rich man, instead of a man that had all his assets seized by the Government. As the Court knows, Petitioner's wife, who is totally innocent, has been left destitute by the Government's actions in this case, and if Petitioner was released based on time served he could readily get work again, support his wife, and earn money to pay off his investors.

## I. PETITIONER'S SENTENCE SHOULD BE REDUCED TO TIME-SERVED, OR AT THE VERY LEAST, TO 24 MONTHS

Petitioner's 11(c)(1)(C) Plea Agreement is very clear. Had Petitioner had the ability to raise $1,000,000, or was a wealthy Wall Street Investment Banker, he would have received a sentence of only 24 months. Not only is this "bargain" a clear violation of the Due Process Clause, it is also a violation of the Fourteenth Amendment's promise to all American citizens of equality under the law. Moreover, if Petitioner's wife had been wealthy, she could have posted the bond for restitution with the Court and would not be living hand-to-mouth as she is now. Petitioner has several opportunities for gainful employment once he leaves prison. There is no benefit to Society, the investors, or to Petitioner's family to keep him in prison when he can be supporting his wife, helping to sell the business to recoup funds lost by investors, and otherwise pay off his restitution and taxes as a productive member of Society. Languishing in prison, Petitioner cannot take care of his wife or pay restitution to his investors. And, at Petitioner's age of 78, there is precious time left for Petitioner to achieve these goals.

## II. THE GOVERNMENT MISCALCULATED THE LOSSES IN THIS CASE

Petitioner respectfully requests the Court to take into account the Sentencing Guidelines that a defendant should only be held responsible for sentencing purposes for those losses that he actually intended to cause. As Petitioner was an investment advisor for 50 years, he clearly did not intend that his investors lose money. Therefore, the miscalculated Sentencing Guidelines created an Offense Level far higher than warranted to achieve the desired goal of a sentence to be "sufficient but not more than necessary."

Everyone unquestionably has the right to be sentenced on the basis of accurate facts, not misinformation and speculation on the part of the Government. *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017), *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948). This did not happen in Petitioner's case. Instead, the Government miscalculated the stream of payments that Petitioner made to Investors in the early years, and undervalued the assets which, if sold, would make the investors whole. But, even assuring there is a loss overall, at the very least Petitioner should have credit for the fair market value of these assets for his $1 million restitution bond. It is simply unconstitutional for the Government to tie-up and otherwise seize someone's assets then require $1 million more to affect their freedom and liberty. Therefore, the Court should remedy this Constitutional error of the most fundamental kind and order release to Home Confinement so Petitioner may seek gainful employment to support his ailing wife and repay the investors.

## III. THE GOVERNMENT IGNORED THE NEW DEFINITION OF INTENDED LOSS PURSUANT TO SGA 792

Amendment 792, which became effective on November 1, 2015, essentially settled a dispute among the Circuits by adopting the *Manatau* Standard and the existing law in the Second Circuit of a *subjective measure of intended loss*. U.S.S.G. Supp. App. C, Amend. No. 792, at 110-14 (2015). Under the revised commentary to U.S.S.G. §2B1.1, Application Note 3(A)(ii), adopts the *Manatau* Standard where intended loss under §2B1.1 means only the pecuniary harm that ***the defendant himself purposefully sought to inflict.***

In her seminal article for the *NYU Journal of Law and Business* (see Issue 12.1, Fall 2015), Judge Patti Saris, the former Chair of the Sentencing Guidelines Commission, makes a number of points on why the Guidelines had to change for Economic Fraud Crimes. She quotes extensively from a number of opinions, such as Judge Rakoff's opinion in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), and Judge Underhill's opinion in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013). In discussing the new Amendments affecting the Sentencing Guidelines for Economic Fraud crimes, Judge Saris also frequently commented on the great disparity of sentences, citing such famous cases as *United States v. Collins*, 581 Fed.Appx. 59 (2d Cir. 2014), where the attorney at the center of the infamous Billion dollar REFCO fraud received only a year and a day sentence and that was after two trials, and a Billion Dollar check-kiting scandal involving Adam Weitsman, where he also received a sentence of only a year and a day. *See United States v. Weitsman*, 03-cr-00317 (N.D.N.Y. 2004).

In a more recent multi-million dollar check-kiting scandal, Pakistani businessman Saquib Khan was looking at a sentence of 8-9 years but received a sentence of probation and some community service, *see United States v. Khan*, 13-cr-00268 (E.D.N.Y. 2014), and in the Raj Gupta case, he was involved with hundreds of millions of dollars of insider trading violations but received

a sentence of only 24 months. Finally, Judge Saris in her comments and in the law review article discussed a $77 million fraud against Medicare and the US Government, where one of the officers of the fraudulent company received probation as well, despite looking at a sentence of 14 years or more. Please see *United States v. Khandrius*, 613 Fed.Appx. 4 (2d Cir. 2015), and *United States v. Wahl*, 563 Fed.Appx. 45 (2d Cir. 2014).

There are of course other cases that Judge Saris refers to as to why it was necessary to amend the Sentencing Guidelines for White-Collar Economic Fraud Crimes, but suffice it to say, Judge Saris clearly points out the problems of the great disparity in sentencing between similar individuals in similar situations. For example, in the case of Daniel Kornblatt, a former IRS agent and tax attorney, who pled guilty to conspiring with a client to deprive the government of taxes in a $29 million fraudulent tax-evasion scheme; despite defrauding the US Government itself, Mr. Kornblatt received a sentence of only 18 months. *See United States v. Kornblatt*, 14-cr-00581 (E.D.N.Y. 2014) (sentenced to 18 months on May 22, 2017). In her *NYU Journal of Law and Business* article assessing the use of Intended Loss in Economic Fraud Crimes, Judge Saris wrote:

> The promulgated amendment revises the initial portion of the definition to read that "intended loss" means the "pecuniary harm that the defendant purposely sought to inflict." This language reflects certain principles discussed in the Tenth Circuit's decision in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). In that case, the defendant was convicted of bank fraud and aggravated identity theft. The district court held that the intended loss should be determined by adding up the credit limits of the stolen convenience checks, because a loss up to those credit limits was, in the government's words, "'both possible and potentially contemplated by the defendant's scheme.'" The Tenth Circuit reversed, holding that "intended loss" contemplates "a loss the defendant purposely sought to inflict," and that the appropriate standard was one of "subjective intent to cause the loss." Such an intent, the court held, may be based on making "reasonable inferences about the defendant's mental state from the available facts." "The amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, *but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability*." NYU Journal of Law and Business, Issue 12.1, Fall 2015, at 27 (emphasis added).

Therefore, as Judge Saris explained in her commentary on the new Sentencing Guidelines Amendments, the newly adopted "*Manatau* Standard" in the amended Sentencing Guidelines is very important to this case for several reasons. First, a defendant's Sentencing Guidelines should only be based on the amount of loss that the defendant *himself* actually intended to inflict on the victim(s). Second, and perhaps even more important in this case, is that with the Sentencing Guidelines adopting the new *Manatau* Standard, the Commission also adopted the "*mens rea*" standard of *Morissette* in *Manatau*, which holds for the defendant's conduct to be criminal, he must have actually known he was breaking the law and that he was *intentionally* causing "criminal" harm to the victim. As was stated by Justice Gorsuch in *Manatau*:

> But it is equally true that American criminal law often restricts liability to cases where an intentional choice to do a wrong is present. As Justice Jackson explained, "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.... *Morissette v. United States*, 342 U.S. 246, 250 (1952). The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter.... The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051 (emphasis in original).

Therefore, no "intended loss" or "tangible economic harm" can be said to have resulted from the scheme based on the new standard adopted by Amendment 792. It is also difficult to imagine how Mr. Bischoff could have "intended" to cause the alleged victims any actual harm, much less the "concrete harm" required under *Rossomando* and *Starr*, or the new standard of "tangible economic harm" as required by *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) and *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994).

## IV. PETITIONER'S OFFENSE LEVEL WAS MISCALCULATED BECAUSE HIS SENTENCING GUIDELINES WERE MISCALCULATED

In its recent decision vacating the sentence imposed based on a single miscalculation of the Sentencing Guidelines, the Supreme Court stated the following:

> District courts must determine in each case what constitutes a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the overarching sentencing purposes of "retribution, deterrence, incapacitation, and rehabilitation." *Tapia v. United States,* 564 U.S. 319, 325 (2011); 18 U.S.C. §§3551(a), 3553(a)(2). Those decisions call for the district court to exercise discretion. Yet, to ensure "'certainty and fairness'" in sentencing, district courts must operate within the framework established by Congress. *United States v. Booker,* 543 U.S. 220, 264 (2005) (quoting 28 U.S.C. §991(b)(1)(B)). The Sentencing Guidelines serve an important role in that framework. "'[D]istrict courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" *Peugh v. United States,* 569 U.S. 530, 541 (2013) (quoting *Gall v. United States,* 552 U.S. 38, 50, n.6 (2007)). Courts are not bound by the Guidelines, but even in an advisory capacity the Guidelines serve as "a meaningful benchmark" in the initial determination of a sentence and "through the process of appellate review." *Rosales-Mireles v. United States*, 138 S.Ct. 1897, 1903-04 (2018), *citing Peugh* at 541.

Of course, to consult the applicable Guidelines range, a district court must first determine what that range is. This can be a "complex" undertaking as discussed in another Supreme Court decision vacating a sentence calculation off by only one month, *Molina-Martinez v. United States,* 136 S.Ct. 1338, 1342 (2016). The United States Probation Office, operating as an arm of the district court, first creates a presentence investigation report, "which includes a calculation of the advisory Guidelines range it considers to be applicable." *Id.*; see F.R.Crim.P. 32(c)(1)(A), (d)(1); United States Sentencing Commission, Guidelines Manual §1B1.1(a) (Nov. 2016) (U.S.S.G.). That calculation derives from an assessment of the "offense characteristics, offender characteristics, and other matters that might be relevant to the sentence." *Rita v. United States,* 551 U.S. 338, 342 (2007). Specifically, an offense level is calculated by identifying a base level for the offense of conviction and adjusting that level to account for circumstances specific to the defendant's case, such as how the crime was committed and whether the defendant accepted responsibility. *See*

U.S.S.G. §§1B1.1(a)(1)-(5). A numerical value is then attributed to any prior offenses committed by the defendant, which are added together to generate a criminal history score that places the defendant within a particular criminal history category. §§1B1.1(a)(6), 4A1.1. Together, the offense level and the criminal history category identify the applicable Guidelines range. §1B1.1(a)(7). As the Court knows in this case, there was no examination of Mr. Bischoff's sentence in light of SGA 792.[1] This is clear error.

Obviously, the Court has the ultimate responsibility to ensure that the Guidelines range it considers is correct, and the "[f]ailure to calculate the correct Guidelines range constitutes procedural error." *Peugh* at 537. Given the complexity of the calculation, however, district courts sometimes make mistakes. It is not surprising, then, that "there will be instances when a district court's sentencing of a defendant within the framework of an incorrect Guidelines range goes unnoticed" by the parties as well, which may result in a defendant raising the error for the first time on appeal as happened in *Molina–Martinez* at 1343.

In *Molina–Martinez,* the Court recognized that "[w]hen a defendant is sentenced under an incorrect Guidelines range - whether or not the defendant's ultimate sentence falls within the correct range - *the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error*." *Id.* at 1345 (emphasis added). In other words, an error resulting in a higher range than the Guidelines provide usually establishes a reasonable probability that a defendant will serve a prison sentence that is more than "necessary" to fulfill the purposes of incarceration. 18 U.S.C. §3553(a); *Tapia* at 325. "To a prisoner, this prospect of additional time behind bars is not some theoretical or mathematical concept." *Barber v. Thomas,* 560 U.S. 474, 504, (2010) (Kennedy, J., dissenting). "[A]ny amount of actual jail time" is

[1] *See* SGA 792 at §2B1.1.

significant for Sixth Amendment purposes, *Glover v. United States,* 531 U.S. 198, 203 (2001), and "ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration," *United States v. Jenkins,* 854 F.3d 181, 192 (2d Cir. 2017). The possibility of additional jail time thus warrants serious consideration in a determination by the Court whether to exercise its discretion under §2255. It is crucial to maintaining public perception of fairness and integrity in the justice system that courts exhibit regard for fundamental rights and respect for prisoners as "people." *Molina-Martinez* at 1346.

The risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error because of the role the district court plays in calculating the range and the relative ease of correcting the error. Unlike "case[s] where trial strategies, in retrospect, might be criticized for leading to a harsher sentence," Guidelines miscalculations even if a defendant is sentenced on a non-guideline basis, ultimately result from the Court relying upon erroneous governmental information. *Glover* at 204; *see also Peugh* at 537. That was especially so in this case where the Court's error in sentencing was based largely on the Government's erroneous use of the non-existent loss amounts in this case and on inaccurate facts provided by the Government to the Court. This in and of itself is a violation of the Due Process Clause. *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017), *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948) where the Supreme Court stated: "...what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation." *Delacruz* at 175, *citing Townsend* at 741. Moreover, "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand

for retrial does." *Molina–Martinez* at 1348–49. "A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." *United States v. Williams,* 399 F.3d 450, 456 (2d Cir. 2005).

Ensuring the accuracy of Guidelines determinations also serves the purpose of "providing certainty and fairness in sentencing" on a greater scale. 28 U.S.C. §994(f); *see also* §991(b)(1)(B); *Booker* at 264. The Guidelines assist federal courts across the country in achieving uniformity and proportionality in sentencing. *See Rita* at 349. To realize those goals, it is important that sentencing proceedings actually reflect the nature of the offense and criminal history of the defendant, because the United States Sentencing Commission relies on data developed during sentencing proceedings, including information in the presentence investigation report, to determine whether revisions to the Guidelines are necessary. *Id.* at 350. When sentences based on incorrect Guidelines ranges go uncorrected, the Commission's ability to make appropriate amendments is undermined.

In broad strokes, the public legitimacy of our justice system relies on procedures that are "neutral, accurate, consistent, trustworthy, and fair," and that "provide opportunities for error correction." In considering claims like Mr. Bischoff's, "what reasonable citizen wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?" *United States v. Sabillon–Umana,* 772 F.3d 1328, 1333–34 (10th Cir. 2014) (Gorsuch, J.). As the Supreme Court has repeatedly explained: "the Guidelines are the starting point for every sentencing calculation in the federal system," *Hughes v. United States,* 138 S.Ct. 1765, 1775 (2018)(quoting *Peugh* at 542). The error in Mr. Bischoff's case is clearly manifest error and should be corrected now.

Respectfully Submitted,

/s/ William A. Bischoff

William A. Bischoff
Petitioner, Incarcerated Inmate
Reg. No. 16047-049
FMC Devens
P.O. Box 879
Ayer, PA 01432